**UNITED STATES v. McGOVERN.**
No. 469.

Circuit Court of Appeals, Second Circuit.
Aug. 23, 1932.

Daniel F. Cohalan, of New York City (Daniel F. Cohalan, John F. Collins, Harry S. Bandler, David V. Cahill, and George J. Langley, all of New York City, of counsel), for appellant.

George Z. Medalie, U. S. Atty. (Thomas E. Dewey, David Paley, and Murray I. Gurfein, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge (after stating the facts as above).

The appellant now complains because, as he says, due process of law was denied him, in that "there was no attempt to formulate or define an accusation against the defendant. He was confronted with an entire record, was told that he had testified falsely before the Grand Jury and that the false testimony was in the record of the proceedings." The short and sufficient answer to this is found in the fact that counsel for the appellant expressly waived objection at the opening of the hearing. That there was any doubt or misapprehension as to the charges is inconceivable and we need now take no time, in view of the waiver of objection, in considering the sufficiency of the specifications. On May 25th the district attorney clearly stated the substance of the grounds upon which the appellant was presented for contempt, and he was given until May 31st to prepare to meet them. There is no suggestion in the record, until after the judgment was entered and the court requested counsel to speak on the question of sentence, that the time and opportunity given him was not ample. There is no set form to which such a proceeding as this for contempt not committed in the presence of the court must conform, but it is essential that the accused be acquainted with the charges and given a fair and reasonable opportunity to meet them either in the way of a complete defense or of explanation and in mitigation of the sentence. He must be given an opportunity to secure the help of counsel and to present evidence relevant to the issues if he desires to do so. Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 69 L. Ed. 767; Randall v. Brigham, 7 Wall. 523, 19 L. Ed. 285; In re Savin, 131 U. S. 267, 9 S. Ct. 699, 33 L. Ed. 150. This appellant was accorded all this. He had his day in court, and now has no just cause for complaint about the procedure. O'Connell v. United States (C. C. A.) 40 F.(2d) 201; Lang v. United States (C. C. A.) 55 F.(2d) 922.

The power of the court to punish for contempt committed in its presence "or so near thereto as to obstruct the administration of justice" rests upon Judicial Code, § 268 (28 USCA § 385). The power extends to witnesses before a grand jury. O'Connell v. United States, supra.

What a grand jury may investigate or the scope of its inquiry cannot be questioned by a witness before it. Blair v. United

States, 250 U. S. 273, 39 S. Ct. 468, 63 L. Ed. 979. All persons within its jurisdiction, upon being lawfully summoned before it, are bound to disclose what they know in answer to questions asked to discover the truth concerning the matters being investigated. Neither the competency of their testimony or its relevancy is their concern. Nelson v. United States, 201 U. S. 92, 26 S. Ct. 358, 50 L. Ed. 673. As no formal charge against any one need have been made before a witness can be compelled to testify before a grand jury, Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652, it is obvious that a witness can rarely, if ever, know whether his testimony is relevant or not. Indeed, the purpose of the grand jury's inquiry is to get at facts which will enable it to determine whether formal charges should be made against some one and not to try offenders. Hendricks v. United States, 223 U. S. 178, 32 S. Ct. 313, 56 L. Ed. 394. As the investigation proceeds, whatever leads may be developed must be run down to find as accurately as possible what the truth is, and any false testimony which impedes and hampers the course of the investigation is material in the sense that it has a tendency to affect the ultimate action of the grand jury. Carroll v. United States (C. C. A.) 16 F.(2d) 951. Evasions and half truths which hinder and mislead stand the same. A wiley witness who avoids the danger of a blunt refusal to answer by mere lip service to his duty and conceals the truth by the use of words may be as obstructive as his fellow of less mental agility who simply says nothing. When the answers of a witness amount to the crime of perjury, the offender may be guilty of contempt, provided there is also some obstruction of justice in addition to the necessary elements of that crime. Ex parte Hudgings, 249 U. S. 378, 39 S. Ct. 337, 63 L. Ed. 656, 11 A. L. R. 333. But the power to punish for contempt does not reside in the court to compel a witness to testify in accord with the court's conception of the truth. On the other hand, a witness who obstructs the course of justice by so acting that the court's performance of its duty is frustrated is not beyond the reach of the contempt power because he chooses false swearing as the means to his end in so doing. Of course, the contempt power does not afford an alternative method for trying an accused for perjury. No deprivation of the right of one charged with that crime to a trial by jury can be sanctioned. Perhaps the best way to put it is that, where the court is justified in believing, and does believe, that a witness has obstructed the administration of justice, the witness may be adjudged in contempt whether he has sworn falsely or not, but, where the court is not justifiably convinced that the performance of its duties has been obstructed, it cannot act under the contempt power even though perjury has been committed.

When this test is applied to the conduct of the appellant, it is plain that he was properly adjudged in contempt if (1) his failure to disclose with substantial accuracy what use he had made of the $380,000, he drew in cash was obstructive and (2) he could have done so.

However resentful he may have been of what he may have considered an invasion of his right, as he conceived it, to keep his knowledge to himself, it was not for him to determine what the grand jury ought to know. Cases supra. His claim of privilege may well have been based on an ill-advised notion of his right to privacy in his own affairs. That matters not now, for he subsequently answered that he never paid Commerford or McConville or Huddell anything. If that was the fact, it is impossible to credit him with an honest belief, when he refused to testify, that he would incriminate himself by his answers. No sane business man could think that he would incriminate himself by disclosing the fact that he had paid those men nothing. That, too, is of slight importance now. But, after his claim of privilege had turned out to be but a sham, the grand jury was not bound, any more than they ever would have been, to accept his answers as the quietus of their investigation so far as he was concerned. Despite the fact that he said he never paid those three men anything directly or indirectly, the grand jury very properly sought to pursue the matter far enough to decide for itself whether this was so. The obvious thing was to find out what he had done with the money which he had been at pains to take to himself in cash, and draw their own conclusions from the facts rather than accept the appellant's interpretation of whatever the facts were as summed up in his denial that he had paid these men directly or indirectly. Then he told of his fear of banks collapsing; of the dangers inherent in his business; of the need to safeguard the future by having this money at hand; of keeping it in his safe deposit box; of being mistaken about that, when his story was checked up; of keeping it in his safe; of losing some of it at cards; of giving some of it to his family; of using it for charity; and, in short, of being so immersed in his affairs that he could not remem-

ber except in a vague general way what he had done with it. A man who was so fearful that his business might suffer from untoward happenings in the future that he would provide a fund in cash to be kept in his safe by himself alone and would continue to replenish the fund over a period from June 5, 1928, when the first check was drawn to April 5, 1929, would hardly have been expected to have no definite knowledge of what had become of the money when asked about that in 1932. That he should fritter it away or risk it at cards while holding it against business emergencies is preposterous. Equally so is the thought that he was unable to tell with reasonable accuracy what he had done with it. He was no callow youth with the irresponsibility of the young spendthrift, but a successful business man in control of a large organization. He said the money was loaned to him. He said he spent it as he pleased. And he said he held it to protect his business. That one can read his testimony and be blind to his palpable concealment of the knowledge he had and was asked to disclose seems beyond reason. The handy talk of cash in safe places without knowing, with even an approach to something definite, what became of it can have its appeal only for the most credulous.

Having had ample opportunity to answer the questions asked him concerning a subject which the grand jury was properly investigating and plainly having resorted persistently to subterfuge and evasion; if not to deliberate falsifying, to prevent a disclosure of what knowledge he had and was asked to give, he was guilty of obstructing the grand jury in performing its duties, and was properly held in contempt.

Judgment affirmed.